AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br>John J. Kotchkoski<br><br>Defendant(s) | Case No. 2:21-mj-627 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **August September 2021** in the county of **Franklin** in the **Southern** District of **Ohio**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Possess With Intent to Distribute a Mixture of Substance Containing 400 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl |

This criminal complaint is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Kevin D. Cooper, FBI Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence. VIA FACTIME

Date: 9/28/2021

City and state: Newark, OH

_____
Elizabeth A. Preston Deavers, U.S. Magistrate Judge
*Printed name and title*

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AGAINST:

### JOHN J. KOTCHKOSKI

I, Kevin D. Cooper, Task Force Officer with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Ohio Bureau of Criminal Investigation (BCI), where I have served for over twenty-one years. Since November 2016, I have been deputized as a Task Force Officer with the Federal Bureau of Investigation (FBI), Cincinnati Division-Columbus Resident Agency. I am currently assigned to the Public Corruption Squad. As such, I am an "investigative or law enforcement officer" of the United States within the definition of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516. Prior to working as a Task Force Officer with the FBI and Special Agent with the BCI, I served as a local municipal police officer and detective and have held a certification as an Ohio Peace Officer since 1994. I have an undergraduate degree in accounting and am a Certified Public Accountant, being licensed continually to practice public accounting since 1984.

2. During my twenty-seven (27) plus year law enforcement career as a FBI Task Force Agent, a BCI Special Agent and a local municipal police officer and detective, I have conducted numerous criminal investigations, to include such crimes involving public corruption, financial crimes, crimes of violence, including homicides and sexual assaults, cybercrime, narcotic offenses, and money laundering. I have participated in various investigations involving computer-related offenses including internet-based fraud. I have executed numerous search warrants, including searches and seizures of physical structures, cellular phones, computers, digital media, software, and other electronically stored information. I have experience in debriefing and interviewing of defendants, witnesses, informants, and other persons who have knowledge of various types of illegal activities. I have experience using sophisticated investigative techniques to include electronic surveillance, GPS tracking devices, telephone tracking, and wiretaps.

3. The facts in this Affidavit come from my observations and experience with this investigation, as well as investigative reports and information provided to me by other federal and state law enforcement officers, my training and experience, and information obtained from other agents and witnesses. This Affidavit does not set forth all my knowledge about this matter.

4. This Affidavit describes some conversations and statements that were originally conducted in Spanish. With the exception of Marco Merino's post-arrest statements, those communications were then translated into English by an FBI translator in a draft summary form and not verbatim transcriptions. While no direct quotes are utilized in this Affidavit, due to the Spanish draft summary translations, the words used when describing the statements spoken or

written throughout this Affidavit are accurate and true to the meaning of the actual verbatim statements to the best of my knowledge.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to arrest John J. KOTCHKOSKI for Conspiracy to Possess With Intent to Distribute a Mixture of Substance Containing 400 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl, in violation of 21 U.S.C. § 846.

## PROBABLE CAUSE

6. At all times relevant to this Affidavit, John KOTCHKOSKI was a police officer with the Columbus Division of Police (CPD), assigned to investigate drug crimes.

7. I, along with other agents and officers from the FBI, the Columbus Division of Police (CPD), and the BCI, have been investigating allegations of criminal activity by members of CPD's Drug Cartel Unit, including KOTCHKOSKI and Marco Merino. Over the course of this investigation, I have become familiar with the organization and structure of the CPD Drug Cartel Unit, as well as the nature and scope of the CPD Drug Cartel Unit's duties.

8. The FBI has also investigated allegations of corruption and drug trafficking by Marco Merino, another member of the Drug Cartel Unit, and on 28 September 2021, Merino was arrested based on these allegations. Some of this information comes from an individual referred to as the "Cooperating Human Source #1" or "CHS #1," who has been determined to be highly reliable, in that his information has been corroborated extensively through the use of recorded conversations, recorded telephone calls, physical surveillance, seizure of narcotics provided to CHS #1 by Merino, and other investigative techniques. CHS #1's information has also been corroborated by Merino's own statements after his arrest.

9. CHS #1 met Merino in 2020 so that CHS #1 could cooperate and work with Merino in an effort to potentially reduce his own sentence. CHS #1 provided information to Merino about drug activity in and around Columbus, Ohio. Merino began engaging in criminal activity, however, including providing CHS #1 with cocaine and fentanyl and repeatedly accepting thousands of dollars in cash in exchange for the protection and safe transport of what was represented to be kilograms of cocaine.

### Merino Distributes Approximately One Kilogram of Fentanyl with KOTCHKOSKI Nearby

10. On 05 August 2021, Merino and CHS #1 met in person. At the direction of the FBI, CHS #1 consensually recorded the conversation held inside of a vehicle operated by Merino. The meeting was also video recorded. During the meeting, Merino provided CHS #1 with what was later determined upon evidence submission to be 1101.4 grams, including the packaging, of a white powdery substance that was later determined by the Ohio BCI laboratory to contain a detectible amount of fentanyl.

2

11. Cell phone location data received from Verizon showed that two cell phones known to be used by Merino were in the area of the meeting that occurred between CHS #1 and Merino on 05 August 2021 at 1:27 PM.

12. Furthermore, cell phone location data received showed that a cell phone known to be used by KOTCHKOSKI was in the vicinity of the meeting between CHS #1 and Merino at 1:26 PM on 05 August 2021. FBI Agents physically observed a Columbus Division of Police undercover vehicle, known to be utilized by and assigned to KOTCHKOSKI, in the area of the meeting between Merino and CHS #1, and again leaving the area of the meeting during the same time frame. That cell phone was assigned a phone number that records from Verizon show was assigned at the time to KOTCHKOSKI.

13. On 09 August 2021, Merino and CHS #1 met again. At the direction of the FBI, CHS #1 consensually recorded the conversation held inside of a vehicle operated by Merino. The meeting was also video recorded. Prior to the meeting, the FBI provided CHS #1 $32,500 to be provided to Merino for the fentanyl that Merino provided to CHS #1 on 05 August 2021. During the meeting, CHS #1 provided the money to Merino. I know that providing fentanyl to an informant to further distribute, and accepting payment for the sale of fentanyl, are not consistent with legitimate law enforcement activity.

### First Protection of a Purported Shipment of Cocaine

14. On 11 June 2021, Merino met with and had a conversation with CHS #1 and an FBI undercover employee (UCE #1). The conversation was consensually recorded by CHS #1 and UCE #1 at the direction of the FBI. The conversation was conducted in Spanish and later translated by an FBI translator. UCE #1 was represented to be a higher-ranking member of the drug trafficking operation that CHS #1 worked for. During the conversation, Merino explained to UCE #1 that he was a law enforcement officer and would be able to assist UCE #1 in the trafficking of narcotics in and through Columbus. Merino said he could use law enforcement databases to provide protection for UCE #1's narcotics trafficking. Merino offered to provide protection for UCE #1's large shipments of cocaine in and through Columbus, including offering to intervene in the event that the cocaine were to be intercepted by law enforcement. Merino also offered to provide protection for the shipment outside of Ohio. Merino advised he had a friend called "Alex" who could help UCE #1 protect transports of narcotics across the state.

15. On 12 August 2021, UCE #1 met with Merino to discuss protecting a transport. UCE #1 told Merino he would be protecting a drug shipment of 20 kilograms of cocaine from the Dayton, Ohio area to an area east of Wheeling, West Virginia, where they would transfer the load to UCE #1's purported customer, UCE #3. These conversations were at the direction of the FBI, and the transportation of cocaine was a fabrication as part of a law enforcement operation. UCE #1 asked Merino where were Merino's associates who would be providing protection, and asked when UCE #1 would be able to meet them. Merino told UCE #1 that he was the only one who would be with the transport because the others did not want to show their faces. Merino told

3

Case: 2:21-mj-00627-EPD Doc #: 1 Filed: 09/28/21 Page: 5 of 9 PAGEID #: 5

UCE #1 that Merino had two others who would be on the radio and would know what to do. UCE #1 and Merino agreed to payment of $10,000 for Merino and $2,500 for each of Merino's associates, for a total of $15,000 in exchange for protecting the transport of the notional cocaine.

16. On 13 August 2021, and prior to Merino meeting with UCE #1 at the Dayton location, cell phone location data received from Verizon showed KOTCHKOSKI's phone to be moving away from his residence near Marengo, Ohio, and heading south on I-71 towards Columbus at 9:26 AM. According to Verizon cellular call records, KOTCHKOSKI called Merino at 9:39 AM. The call lasted approximately three minutes and nine seconds.

17. Continuing on 13 August 2021, at approximately 10:00 AM, Merino met with UCE #1 in the Dayton area, after which the transport began. During the time of the transport, Verizon cellular location data showed KOTCHKOSKI's phone to be located at or near the intersection of I-70 and Hilliard Rome Road at 10:26 AM, 10:41 AM, and 10:55 AM as Merino's phone was in the same area on eastbound I-70.

18. Continuing on 13 August 2021, Merino continued to follow the transport vehicle into West Virginia, stopping at a location east of Wheeling at approximately 1:09 PM. At the conclusion of the transportation, UCE #1 met Merino and provided Merino with $15,000. UCE #1 introduced Merino to the purported buyer of the cocaine, who in fact was an FBI undercover employee (UCE #3). Merino and UCE #1 parted ways at approximately 1:40 PM.

19. According to Verizon cellular call records, Merino called KOTCHKOSKI at 1:43 PM, 3:44 PM, and 3:59 PM on 13 August 2021. These calls between KOTCHKOSKI and Merino lasted four minutes (4:00), two minutes and eighteen seconds (2:18) and two minutes and fifty-one seconds (2:51), respectively.

20. Continuing on 13 August 2021, Verizon cellular phone location data showed KOTCHKOSKI's phone and Merino's phone both in the area of Watermark Drive and Riverside Drive/State Route 33 in Columbus between approximately 4:45 PM and 5:15 PM.

### Merino Distributes Multiple Kilograms of Fentanyl, then Meets KOTCHKOSKI

21. On 28 August 2021, Merino met UCE #3 at a location east of Wheeling, West Virginia. The meeting was conducted in English and was consensually audio and video recorded by UCE #3. Merino had previously asked UCE #3 if he could help Merino sell "four," which in my training and experience and work on this investigation, I believe to refer to kilograms of a controlled substance. UCE #3 agreed. During the meeting, Merino provided multiple packages of a powdery substance that law enforcement determined to collectively weigh 8328.1 grams, including the packaging. Through electronic surveillance and physical surveillance, the United States determined that Merino traveled from the Columbus area to the meeting with UCE #3 without making a stop outside the Southern District of Ohio. Merino told UCE #3 that the packages actually contained 7.5 kilograms of fentanyl. I know based upon my training and

4

experience that providing fentanyl to an informant to further distribute is not consistent with legitimate law enforcement activity.

22. Continuing on 28 August 2021, During the recorded conversation, UCE #3 described the items Merino provided as cocaine. Merino then stated, "No no, that's fetty," which in my training and experience I know to be referring to fentanyl. UCE #3 then responded with surprise and the two then talked and made reference to how dangerous of a substance fentanyl is. Merino responded to the conversation referencing the dangers of fentanyl by nodding his head in agreement and saying "Yeah. Oh yeah dude." Merino then told UCE #3 twice to "be careful" with the fentanyl and "I am so glad I told you." When UCE #3 discussed that it would have been bad if UCE #3 were to give the fentanyl to someone and the other person were to cut the packaging open without knowing it was fentanyl, Merino responded by saying "Right, and not even knowing, they'll fucking drop right there" and then laughed. Merino and UCE #3 parted ways at approximately 12:03 PM.

23. Continuing on 28 August 2021, Verizon cellular call records from that date show that Merino called KOTCHKOSKI at 1:04 PM. FBI Agents later observed KOTCHKOSKI and Merino meeting in the area of E. Main Street between S. Third Street and S. Fourth Street in Columbus. Cellular phone location data received from Verizon for August 28, 2021, showed KOTCHKOSKI's phone and Merino's phone both to be in the area of E. Main Street and S. Third Street in Columbus from 2:57 PM until 4:27 PM. KOTCHKOSKI was later observed to be operating a gray Dodge Journey Columbus Division of Police covert vehicle, bearing a known Ohio license plate, assigned to the CPD Drug Cartel Unit and known by agents to be utilized by KOTCHKOSKI.

24. On 31 August 2021, samples of the items provided to UCE #3 by Merino on 28 August 2021 were field tested by the Whitehall Police Department and determined to contain a detectible amount of fentanyl. Later, the BCI Laboratory confirmed the field test.

### Second Protection of a Purported Shipment of Cocaine

25. On 01 September 2021, UCE #3 contacted Merino through a messaging application to provide details about Merino providing protection and safe transport of another shipment of cocaine. These conversations were at the direction of the FBI, and the transportation of cocaine was a fabrication as part of a law enforcement operation. During the messaging communications, Merino told UCE #3 that he had a second person to assist with the transport. UCE #3 provided Merino with the meeting spot in the Dayton area and the meeting time as 10:00 AM. Verizon cellular call records from 1 September 2021, indicate KOTCHKOSKI's phone called Merino's phone a total of seven times on 1 September 2021, with the first call at 10:58 AM and the last call at 4:28 PM.

26. On 02 September 2021, Merino met with UCE #3 to initiate a transportation of cocaine from the Dayton area to an area east of Wheeling. On a consensual recording, Merino

5

confirmed payment of $10,000 for him and an additional $5,000 for two associates, a female associate of Merino's who led the transport and acted as a lookout for law enforcement along the route, and for a male coworker that Merino identified as being available via radio to intervene with law enforcement along the route. Merino told UCE #3 he would meet up with the person he worked with later to pay him. No other law enforcement officers were identified by the FBI as being present for the protection. Merino then followed a transport from the Dayton area to an area east of Wheeling. The notional cocaine transport departed at approximately 10:21 AM.

27. Continuing on 02 September 2021, at approximately 1:43 PM, Merino and the notional cocaine transport arrived at the end destination in West Virginia. Merino spoke with UCE #3. Merino told UCE #3 that he worked in the drug cartel unit and there was a guy who he was just on the phone with, who was looking out for him and at work. Merino told UCE #3 this other guy and Merino had filed an EEO complaint together. During this investigation I have learned that Merino and KOTCHKOSKI have filed an Equal Employment Opportunity (EEO) complaint regarding their employment at CPD. UCE #3 provided Merino with $16,000 as payment for the protection of the cocaine transport across Ohio as previously discussed, which included an additional $1,000 for the female driver leading the transport from start to finish.

28. Verizon call records from 02 September 2021 indicate that KOTCHKOSKI's phone called Merino's phone at 1:23 PM and at 2:40 PM. According to cell phone location information received from Verizon for 02 September 2021, Merino's phone was in the vicinity of Merino's residence beginning at 6:02 PM. Cell phone location information also showed KOTCHKOSKI's phone and Merino's phone both to be in the area of Merino's residence from 6:41 PM until 9:27 PM.

## 28 September 2021

29. On 28 September 2021, a cooperating witness spoke to the FBI about their relationship with KOTCHKOSKI. The cooperating witness identified a photo of KOTCHKOSKI as "Alex," and used that name to describe him. (Note that, as described above, on 11 June 2021, Merino told UCE #1 that he had a friend called "Alex" who could help UCE #1 protect transports of narcotics across the state.) The cooperating witness said they initially had acted as a confidential informant for KOTCHKOSKI, but that their relationship had turned to illegal drug trafficking. The cooperating witness said that they had sold approximately 40 kilograms of cocaine that KOTCHKOSKI has provided to the cooperating witness.

30. Continuing on 28 September 2021, the cooperating witness was asked whether any of the drugs KOTCHKOSKI had brought them had any markings or stamps on them. The cooperating witness replied in part that they had previously received kilograms of cocaine with what they described as Mickey Mouse markings on them. (At least four of the 7.5 kilograms of fentanyl that Merino provided to UCE #3 had stamps or markings resembling the logo of Mickey Mouse.)

31.     Continuing on 28 September 2021, the cooperating witness further said that approximately two or three months ago, KOTCHKOSKI had asked the cooperating witness to sell 10 kilograms of fentanyl for him. The cooperating witness did not do so, telling KOTCHKOSKI that the cooperating witness had been unable to find a buyer for the fentanyl.

32.     On 28 September 2021, Merino was arrested for violations of Possession With Intent to Distribute a Mixture of Substance Containing 400 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vi); and Federal Program Bribery, in violation of 18 U.S.C. § 666(a)(1)(B), based on a Criminal Complaint.

33.     Following the arrest of Merino on 28 September 2021, and after Merino was advised of his constitutional rights, Merino voluntarily provided statements to FBI Agents concerning his illegal activity. Merino said that he and KOTCHKOSKI had discussed the drug-trafficking relationship Merino had with UCE #1 and UCE #3, and that Merino had told KOTCHKOSKI the names by which Merino knew UCE #1 and UCE #3. Merino said that KOTCHKOSKI had known that Merino was unlawfully protecting the transportation of cocaine and had agreed to assist. During the transports of the purported cocaine, KOTCHKOSKI had made himself available by radio to make any calls that Merino might need, including to other law enforcement officials, in order to protect the safe transportation of the cocaine. Merino told FBI Agents he paid KOTCHKOSKI half of the money he received when Merino provided protection for the transports from the Dayton area to West Virginia on 13 August 2021 and 02 September 2021.

34.     Continuing on 28 September 2021, Merino told FBI Agents KOTCHKOSKI had given him 7.5 kilograms of fentanyl to sell to Merino's contact. Merino told FBI Agents that KOTCHKOSKI had told him that the person described in this Affidavit above as the cooperating witness had been unable to sell the fentanyl. Merino told FBI Agents he provided UCE #3 the 7.5 kilograms of fentanyl provided to Merino by KOTCHKOSKI to sell. According to Merino, Merino was going to receive between $60,000 and $80,000 for the sale of the fentanyl.

35.     Continuing on 28 September 2021, at the direction of the FBI, Merino placed a consensually monitored telephone call to KOTCHKOSKI. The telephone call was conducted primarily in Spanish in the presence of FBI Agents. The Affidavit's description of this phone call is based on the statements of Merino and an FBI translator. According to Merino, KOTCHKOSKI had prior knowledge Merino was planning to travel to Miami, Florida, to meet with UCE #1, and used the name by which Merino knew UCE #1. Merino told KOTCHKOSKI that UCE #1 had told him that UCE #3 was having trouble selling all of it, by which Merino meant the entire 7.5 kilograms of fentanyl. Merino did not use the word "fentanyl." Merino used the names by which Merino knew UCE #1 and UCE #3, and KOTCHKOSKI did not ask who those people were or otherwise indicate that those individuals were unknown to him. Merino advised KOTCHKOSKI that UCE #3 could sell only a portion and offered to return the unsold portion and cash for the sold portion. According to Merino, KOTCHKOSKI became irritated and

told Merino words to the effect of, It doesn't work that way because we don't know what they did to the merchandise. According to Merino, Merino suggested KOTCHKOSKI provide the remainder to the person described in this Affidavit above as the cooperating witness.

36. During the same consensual voluntary interview conducted during the 28 September 2021 arrest of Merino, Merino told the FBI that KOTCHKOSKI had told Merino if he ever spoke about any of the illegal acts between Merino and KOTCHKOSKI that KOTCHKOSKI would have Merino's wife and children killed by sicarios. I know based upon my training and experience that sicario is Spanish for a hired killer or hitman, especially in the context of Latin American drug cartels.

## CONCLUSION

37. Based on the foregoing facts, I believe there is probable cause for the arrest of John J. KOTCHKOSKI for a violation of Conspiracy to Possess With Intent to Distribute a Mixture of Substance Containing 400 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl, in violation of 21 U.S.C. § 846.

Respectfully submitted,

Kevin D. Cooper
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on September 28, 2021:

ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE